Good morning. May it please the Court, my name is Robyn Pearson. My name is Antonio Valla, both representing Creagri and Capellant. And Ms. Pearson, you're going to argue? We are both going to argue, but I'm going to begin, if that's acceptable. And we would like to reserve three minutes for rebuttal. That's fine. Have a seat, counsel. I take it you're going first? Yes, I will. And my guess is you don't need your hand held. Go right ahead. I'm old enough now, I think. Your Honor, this case, as you know, involves a trademark infringement issue and the cancellation of a mark based on a summary judgment motion in the district court. And we are before you, based upon that summary judgment standard, that it is only proper to grant that where the record is viewed in the light most favorable to the non-moving party, and it must be demonstrated that there is no genuine issue of material fact. We believe that there are substantial issues of material fact peppered throughout the record before you. And we'd like to start with the primary issue of whether Creagri's use of its mark was lawful and entitled to trademark protection. In this case, USANA, as you are aware, is charging that the use of our client Creagri's mark, which is called olivenol, is unlawful because there was a problem with the labeling concerning the amount of hydro, oh, sorry, hydro, I know, I'm having a problem with that word today. I didn't call it hydro. Oh, thank you very much. I appreciate that. With hydro. More than a problem, wasn't there? At one point in time, the claim was it had 25% hydro, and by the time it was tested, it became 2.6%. That is correct, Your Honors. But I. It was overstated by ten times. It was, but we contend that that was not a material violation and that there was, in many factors, Your Honor, and we start based on the General Mills standard for the labeling violation. We believe that at the time. General Mills was a case where they had, what, a dozen or so packages of cereal that were misbranded in some way. Correct. And they found it, corrected it, and then produced thousands of boxes of cereals that were properly branded. How does that compare to this case? Well, in the case of General Mills, as in this case, the actual violation wasn't one that affected the consumers in any negative way, and there's no evidence whatsoever in the record that has been presented by USANA or its counsel that proves otherwise. At the time that the hydro and the olivenol was released and marketed, which was prior to the mark that was registered June 18, 2002, by USANA in Commerce, the testing that was known at that time to our client was the best standard because this was a new product in a new industry. And they were doing the only thing that they knew how to. It went to two different labs. The test was out there. It wasn't an intentional violation by any means. And it wasn't something that affected the product in any negative way. This is not an FDA regulated product, is it? I'm sorry? This is not a federal drug and food administration regulated product? That's correct. It is? It is not. It is not. So the consuming public is dependent. If it were FDA approved, it would be both safe, tested as safe and effective for use. So in the situation of a product like this, isn't the public dependent on accurate labeling? Well, it depends on the knowledge of the public at the time. But the testing was done numerous times by the lab. And if there was a question, which ultimately there was after the product had been in commerce for over six months, the testing was redone. Are you saying the lab was just incompetent? I'm not saying it was incompetent. I'm saying that it was using the best testing methods available to it at that time. Such a discrepancy between the facts and what they reported. Do you think it must be an incompetent lab? Well, Your Honor, I can't comment on the competency of the lab. Well, it's rather relevant. I can say that. It's rather relevant to your case, whether your client knowingly did this or whether they were in good faith. I believe that it was absolutely good faith and it wasn't knowingly done, and that's why it was constantly retested whenever there was a question or issue that was raised. I think this is very similar to a case where you may have software that's developed by Microsoft, that's commonly being updated and tweaked, and the testing may not be the same as it was when it originally came out. And it is going to change over time, which was the case here. We started with a very new product that, over time, more and more was learned and developed, and the testing would change over time, which it did. And there's testimony in the record from Dr. Crayer, the president of Criagri, Inc., that makes it very clear that testing is still an unknown quantity today. You cannot guarantee any levels of testing because it varies from laboratory to laboratory. So even though the results did change over time, that's to be expected, and there really is no set standard. Well, if you don't know whether it's accurate or not, why do you state it? I don't believe that the product stated that it was accurate. I think on the labels it's pretty clear that throughout the record they believed that there was beneficial use of the product. It was based on the Mediterranean diet, and that this sort of product, like benefits from olives and olive oil, could and may help with diseases like heart disease and cancer and things of that matter. Did it have any olive oil? Trace amounts, but most of that was removed from the process when it was extracted from the olive itself. And I think that's part of the confusion, and actually the PTO, I believe, had some confusion in this issue as well, when she issued her ruling when this was before her. The product itself, Olivenol, is based on that German word that caused confusion at the time. The German word for olive is oliven, O-L-I-V-E-N. Oil, O-L in German, means alcohol, not oil. We've made it, even though there was a mistake initially when the application was submitted in 2001 about the understanding of what olivenol meant, it is not the translation in German of olive oil. And it's more than just the umlau over the last O in the word, and as we've stated in the record as well, if the umlau isn't there, there has to be an O-E to show that it's not there. But olivenol, as spelled, would not lead anyone who speaks German, which was my second language, to understand that that means olive oil. I would understand that to mean olive alcohol and not associate that with olive oil at all, which I think is clear from the statements of our expert witness that are part of the record. You've used about half of your 15 minutes, and you said you wanted to divide your time with co-counsel. I just want to get one other issue out before I surrender. He'll yank me off when he's ready to go. The other issue I'd like to get before the court is the sleek craft factors, which are part of the AMF Inc. sleek craft case. And we believe that there are many factors in dispute here that would raise a tribal issue of fact, and that this issue should go back to the federal court. As peppered throughout the record, we believe that the strength of the mark is very clear, but we believe that there is a likelihood of confusion between the names olivenol and olivol that would cause confusion in the general body of people that would purchase this type of product. In this case, there are similar marks in the both sound of the marks olivenol and olivol, as well as the spelling. There are only two letters that separate the two words, which would cause confusion. There is evidence in the record that olivol and usana, I should say usana, was aware of the olivenol product prior to its mark being filed with the trademark, the patent and trademark office. As far as six months prior to their filing their mark, the scientist or president of usana actually purchased our product on the Internet, which leads somewhat little speculation as to their intent and why they needed to purchase our product prior to releasing their own. There was also evidence in the record from the declaration of Steve Willick, one of the attorneys, a former attorney from our office, who states that a document was inadvertently produced by the other side, which clearly indicated that they were aware and concerned of the usana, of the olivenol mark that was pending by Priagri and thought that that would be a problem with their mark. You're now down to five minutes. Okay. If you want to reserve two, you've left him three. Okay. He doesn't want to say anything, so I'll just follow up. Olivenol also and olivol are really basically the same things and differ in the strength of their composition. So we feel that based on numerous of these sleep craft objectives that there is enough to cause confusion between the marks. So I will stop here. Thank you. Mr. Valla? Okay. You say the remainder of your time for rebuttal? Yes.  Thank you. Counsel? Mr. Kinnear? Wesley Kinnear, appearing for Usana Health Sciences. The question that the district court had to decide and the first question for this court was whether Priagri had proved that there were any lawful uses in commerce before Usana's June 2002 priority date. Any uses, even one. They didn't do that. This is not a case where there were some lawful uses prior to our priority date and then some unlawful uses before that date. Then the question might be, as in General Mills, are those violations de minimis? Are they material? Or do they so taint the other lawful uses that the plaintiff, the proponent of the mark, cannot rely on them to supply the requirements of the statute? The statute itself does not require lawful use, correct? It does not use the word lawful. The courts have consistently. This is a layering on that's been done by the PTO? The PTO and the district courts and, in fact, one circuit court. There's no debate that the uses that are required by the statute have to be lawful uses. And that starts back as early as 1950 in the TTAB, in the Trademark Trial and Appeals Board. Clearly, in the Tenth Circuit, you have to establish lawful use. That's correct. But the question of first impression here, why should we require lawful use? Well, the real issue there is that it's not a question of enforcing the FDCA. We're not talking about a product that has cocaine or heroin in it. We're talking about a product with some health food claims and that's out in the general market and arguably similar to your client's product. You're right, Your Honor. It's not a question of whether or not there are poisons in the product, nor is it a question of enforcing the FDA or some other statute. I believe that the reason that the courts have so consistently required lawful uses is because otherwise you get in the circumstance where people come up with all kinds of nonsense simply to establish priority, much as they did from time to time before the intent-to-use applications were brought in in the late 1980s. That was the circumstance. Before that, what people would do is they would, in effect, send a product to themselves or do something else to rush the product into the stream of commerce to establish a priority date. Under those kinds of circumstances, you would see situations where people skip steps. They didn't file for registration of a food or a drug. Or in the case of the Kwame case, the first time that this was held, this was announced in the TTAB, that was an insecticide case where people did rush to get a product out there, and the result of that was that they failed to register the product with the Department of Agriculture. People skipped steps in order to get the product on the market as fast as possible. The same circumstance, the same policy reason applies now as well when you have intent-to-use applications, because you still have to establish that you've used a product in commerce. They just give you some time after you file the application to do that. But, again, you have the same incentive to rush, to skip steps, to do things that you might not otherwise do in order to establish that priority date. People are rushing to get the name out there. I think that's one public policy reason. I could speculate about others, but I think that's a good one. Let's assume that the panel is prepared to accept that notion, that the use has to not only be in commerce but lawfully in commerce. One of the elements some of the courts have talked about is whether the violation, the misbranding, whatever, has to be material in the sense that it causes serious consumer protection issues. Was that met here? Consumer protection issues, certainly in the way that the panel asked on the opening argument, as I think some courts have articulated, which is that labels matter. The Irving Court articulated that as early on as royal baking. The courts have articulated that labels matter in communicating issues to consumers. Any consumer complaints about this product? None that we're aware of, Your Honor. Any lawsuits? Not that I'm aware of. Any claims of health impairment? None that I'm aware of. Again, that's not the – that I don't believe has been the standard. And, in fact, the only court that has talked about is the – a serious issue of consumer safety has the – was the Perfume Court's advertising to women. And that was an unpublished case from, I believe, the district in Illinois. I like to use this product in the morning called Coffee Mate. It raises the hair on the back of my wife's head when I bring the container out because the container claims that it has no trans fats. But when you read the label, it turns out that it has no trans fats if you use one teaspoon. But if you use a tablespoon or more, it has serious trans fat implications because it contains palm oil and coconut extract and that sort of thing. I don't feel misled. The product is widely sold. Isn't this a good example of a product that may be mislabeled but is not fooling anyone or causing serious concern? I'm not aware of any regulation that that label violates. In fact, I would – I'm guessing, but I think it's an awfully good guess, that they have complied very carefully with the FDA's rules and regulations on how you label those things. You can – the rules are remarkably specific about what you can say and what you can't say. And those policy decisions about what is misleading and what might be harmful or what might mislead a consumer have been made after extensive debate and analysis by the FDA staff under authority from Congress. So I think those decisions have been made. It doesn't mean that somebody couldn't come back and say – and file a lawsuit and say this is hurting me and that there wouldn't be an offense if they disclosed it. But if the question is have they violated a federal law, no, probably not. Is there any evidence in this record of consumer harm? Only in the sense that the consumers were told something that was clearly not true. Now, whether that poisoned anybody or misled people to buy things they would not otherwise have bought, we don't actually know that. There were some suggestions in some newspaper articles or magazine articles that people should buy this because it has olive oil or because it's made from olive oil or, in the case of one clipping, it said if this really has as much hydroxytyrosol as it says it does, then they should – then you should buy it. And Dr. Crea himself has said in his deposition, one of the great things about this is that we have this high concentration of hydroxytyrosol, which, of course, they did not have. On the issue of materiality, again, they have not shown any lawful uses. And, in fact, in their appellate briefs, they've admitted that they violated the statute. That's not really a matter for dispute. What they've said instead is that maybe it wasn't material. Now, what I've been arguing is that that material in this context just means not de minimis, not trivial, because – and that standard is met in this case because they cannot point to a single use of the product before the relevant date that actually was lawful. Likewise, they argue, well, there might have been exceptions to the rules. There might have been exceptions, but they never applied for them. And that point is important for this reason. The rules that the FDA sets out for these exceptions say, step one, you have to apply for it before you put the product out there. They didn't do that. So by definition, per se, they were not even eligible for those exceptions. In any event, the date matters as well. They didn't go out and get the exception so that they did not go out and put a lawful use out before June 18 of 2002. The question is, does your client's product contain olive oil? I'm sorry? Does your client's product contain olive oil? No. And, in fact, there's an important distinction on the product. The olive oil product, the one offered by USANA, is, in fact, an ingredient. It's not the name of a product that's put on a label someplace. It's put on the ingredient list on the back. It's one of many, many different ingredients in the various products. But as far as I know – The answer is no. Correct. No olive oil at all? Not that I'm aware of. Not that I'm aware of. The – let me address the testing issue, since the Court raised it on the opening argument, and that is this. First of all, the label of the product, and it's in the various briefs and the record before you, the label of the olive oil product actually touted the test that they had used. They named the test, and they said – so they quoted the amount of hydroxytyrosol, 25 milligrams, and said as – and then they cited the name of the test, which I can't pronounce and won't try, but they actually cited the test at that time. The second piece is on the reliability of testing. Our experts that we disclosed under Rule 26 said, yes, there were reliable tests, several of them, to determine the amount of hydroxytyrosol in various products. Those did exist. Dr. Crea, on summary judgment, testified that he did not know of any tests at the time that they offered the product. Two things were wrong with that testimony. Number one, Dr. Crea was never disclosed as a Rule 26 expert. Yes, he is a scientist. There's no question about that. But he was never disclosed, and we never got to take any kind of discovery from him as an expert. It's not admissible. Secondly, all he said was that he didn't know of any tests. Well, that's not the issue. The issue is, was there any? Not he didn't happen to know of any, but was there any? Were there any? I'm sorry? Were there any? Yes, there were. And our expert had said. No, I was simply pointing out that you should say, were there any? I beg your pardon, Your Honor. Contrary to fact, correct. Were there any? And there were. Our experts have testified to that. So not only was his testimony inadmissible, it was also irrelevant. Anything else you're dying to tell us? You wrote a terrific brief. Both sides did. Well, I appreciate that, Your Honor. And I think you've teed it up pretty well. Is there something else you want to? Unless the Court has questions, I will end there then. I don't see any other questions. Thank you, Your Honor. Thank you very much for your argument. Rebuttal argument at this time? Just a few things, Your Honor. I would like to point out that we stated throughout the briefs that olivenol contains hydro, obtained from the pulp of organic olives. And this hydro provides the antioxidant effect for which olive oil is acclaimed. So even though olive oil isn't in the product itself, it does have the benefits of the antioxidants, which is so important from the olive oil. Also, I'd like to state that, again, there's nothing before the Court in the record concerning that there was a There is something in the record mentioned by USANA's expert that says that they had tests, but that does not mean that it was the accepted standard for testing this. This was a very new product in the industry, and as I stated before, it's been an ongoing process that still is not precise to this very day. In addition, as far as the exceptions are concerned, Your Honor, we do believe that PREAGRI was entitled to the exceptions that were listed. Even though they were not applied for, this all ties into the argument concerning the testing issue, and if it had been known at that time, we definitely would have applied for it. But I think the record is pretty clear on that issue as well. So that's all I have at this time. Thank you. I don't see any other questions. Thank you for your earlier counsel. Thank you both very much. This is a very interesting case. It's submitted for decision. Thank you for coming in today. Next we have the two direct appeals consolidated for argument, ISA and Gantt. Counselor, President, if they'd come forward. I thought what we might do is give you seven and seven and then allow each of you a minute for rebuttal after the government follows the both of you. Is that satisfactory? Actually, Your Honor, if I may, Rene Valladares, I will be actually making the argument for both cases. Okay. Okay. And you'll do any rebuttal? Yes, Your Honor. Okay. All right.
judges: Noonan, Hawkins, Thomas